**STATE v VAUGHN**

Ohio Appeals, 1st Dist, Hamilton Co

No 5013. Decided Feb 24, 1936

Louis J. Schneider, Cincinnati, Carson Hoy, Cincinnati, and Loyal S. Martin, Cincinnati, for plaintiff in error.

Bert H. Long, Cincinnati, and Milton M. Bloom, Cincinnati, for defendant in error.

**OPINION**

By ROSS, PJ.

It is alleged that a great amount of this evidence was false and untrue and consti-

tuted perjured testimony induced by the parents of the girl who fraudulently sought to use the criminal prosecution as a means of securing financial benefit from the defendant in the criminal case. It is further alleged that the facts showing that the testimony upon which the plaintiff in this instant case was convicted was false, untrue, and perjured did not come to the knowledge of the plaintiff or his counsel until more than 120 days after the verdict, and that, therefore, this plaintiff has no adequate remedy at law. There can be no doubt that this is true, and the demurrer admits the facts showing that such is the case. As far as the pleadings are concerned, and we are dealing alone with these and are not concerned with the nature of the evidence which may be introduced in support of them, an innocent man has been convicted of a most serious offense and the law offers no opening through which this grievous wrong may be reached and righted.

Sec 13449-2, GC, provides in its second paragraph as follows:

"Motions for new trial on account of newly discovered evidence shall be filed within one hundred and twenty (120) days following the day upon which the verdict was rendered."

This is a definite statute of limitations and is directly applicable to criminal cases. It must be admitted that the legislature in passing this limitation knew that evidence which would be mandatory in requiring a new trial if offered within 120 days of the verdict would be made thus completely unavailing if offered on the 121st day. It must be also admitted that all the consequences to an innocent man must have also been considered. With the wisdom of such an attitude we have no concern. It is a matter wholly within the province of that arm of the government of the state, in which the people have reposed the power to create appropriate law. This court cannot legislate.

While one maxim of equity recites that equity will not suffer a wrong to be without a remedy, another states that equity follows the law, and these maxims must be considered together. The books are full of cases where equity, although in some cases curtailing the period of the statute of limitations in its application of the doctrine of laches, has never extended the period beyond that fixed by the law.

But the plaintiff asserts and with reason that he has not been guilty of any neglect.

That as soon as the facts came to his knowledge, he immediately sought the aid of the chancellor. But still equity is faced with the period determined by the law-making body of the state to be sufficient for securing such new evidence. The legislature has in effect said that if within four months such new evidence has not been secured the responsible party is charged with neglect. May the chancellor find otherwise in the face of the legislature's conclusion expressed in the statute? Reluctantly, we conclude that in such a case the chancellor is helpless. If the constitution and the statutes may be set aside by a court of equity because in the opinion of the chancellor such expressions of law are in contravention of natural justice, then one branch of the government will be rendered a nullity as a result of the opinion of another. Such is not the conception of government found expressed in our basic law.

Counsel for the plaintiff have with great diligence presented to us an exhaustive treatise upon the history of equity jurisprudence. Nowhere appears, however, nor are we able to find any controlling authority in which a court of equity has intervened between the state and one found guilty by due process of a violation of its statutes defining a crime against the people.

The iniquitous results of such procedure in addition to that already noted seem to us most obvious. The door would be thrown wide open to grievous fraud and many criminal trials would be but preliminaries to those proceedings of review now permitted by law and further attacks upon the convictions in courts of equity. The chancellor would thus sit in review upon the appellate courts and be the final arbiter of the justice of every conviction. Such has not been the province of courts of equity. Neither sound reason nor regard for full and ample justice require that their province should be so extended.

Let us now look at some of the Ohio decisions wherein have been considered the maxim "equity will suffer no wrong to be without a remedy."

In Michael v National Bank, 84 Oh St, 370, at 384 of the opinion the court say:

"The mischief of endless litigation in which nothing is finally determined, is a thing more to be dreaded than an occasional miscarriage of justice. If by allegation in a bill of equity, that false testimony had been given, or forged documents introduced or new evidence discovered, controversies which had been regularly adjudicated could be opened up, there could be no as-

surance of the conclusive effect of final judgments."

This was the court's attitude toward setting aside a judgment in a civil action.

In **Morningstar et v Selby et, 15 Ohio,** 345, at 366, the court say:

"Again, it is further said that the remedy must be in chancery because the statute has pointed out no mode of proving a spoliated will; and we are asked if there can be so great a wrong as the destruction of a paper divesting another of title, and vesting it in the fraudulent spoliator, without a remedy? In general, it may be said that there is no wrong without a remedy; and were we to say that this case was not without a remedy, it would not follow that this is that remedy. It may be that the Court of Common Pleas, by the grant of power in Article 3, §5, of the Constitution, is clothed with general powers adequate to give the appropriate relief; if not, the legislature can clothe those courts with ample power. It is sufficient for us to say that, in either event, this court will not have appellate jurisdiction, as from a court of probate, to reverse their decision. Nor till after the will shall have been proved, approved, and admitted to record, can this court act in any manner touching or concerning its validity, and then only in the manner prescribed by statute. That mode of proceeding will not have for its object to establish the will, but to determine whether it may or may not have been improperly established by a competent court."

In **McCammon et v Cooper, Trustee et, 69 Oh St, 366,** at 370, the court say:

"But the proviso cannot be aided or enlarged by the application of any equitable rule. As held in **Patterson v Lamson, 45 Oh St, 77,** 'the statutes of descent and distribution are not to be construed and administered upon equitable principles, but by rules of law,' and in **Hutchings v Davis, 68 Oh St 160,** 'courts cannot, by reason of any real or imagined equities limit, qualify or annul rights granted by legislative enactment.' In other words, the general assembly must be held to have intended to express its entire meaning by the natural import of the words used."

Wright, J., in Wright's Report, p. 61, at p. 65, Hulse et v Wright, stated the limitations of chancery jurisdiction:

"While the general chancery jurisdiction in Ohio is as broad as that exercised by courts of chancery in England, it is not, either there or here, without other limit of what is right or wrong than the will or discretion of the chancellor. In that country, and in this, chancery jurisdiction is as clearly defined as that of courts of law, and the chancellor has no more right to enlarge his power than a judge of a court of law. It is true, public exigencies, and the ingenuity that accompanies the infinite variety of human transactions, sometimes call for a new application of an old principle, and gives occasion for the remark, that the law expands with the exigencies of society, and the mind of the judge. In general, it is safer to leave it to the legislature, to enlarge the jurisdiction so as to meet ingenious fraudulent contrivances to effect injustice, than for the judges to grasp at new jurisdiction and power. We will not reject any power conferred upon us, or refuse to do our duty, on account of consequences; yet, we cannot enter an entire new field, in exercising our jurisdiction, without a clear case, or very urgent necessity."

It is to be observed here also that "equity will not do a vain thing."

It has been suggested that this suit was at least prematurely brought in that this court has not handed down its judgment in the error proceeding before referred to. This defect, of course, can be remedied by this court at any time and for the purpose of this case will be considered as done. However, what then is the position of the court of equity? The decree sought will vacate the judgment of a sentence and order the Common Pleas Court to grant a new trial. But this court taking that done which should be done, affirms the judgment of the Common Pleas Court and sends down its mandate ordering execution of the judgment. Does the decree of the court of equity vacate the judgment of this court also? Which order is the trial rourt to obey? On the one hand, a court of concurrent jurisdiction orders a new trial, the court of review directs its refusal. That no judgment has here been entered is conclusive against the plaintiff as his remedy at law has not been exhausted. As was just stated, we refrain from predicating our conclusion upon this ground. Again, if the decree of the chancellor is not obeyed—how will such decree be enforced? Upon what officers and by what means? Has the state consented to be sued in this action? We find nothing to so indicate.

In **Snedaker v King, 111 Oh St, 225,** the plaintiff sought to enjoin the defendant from alienating the affections of her hus-

band. At page 229 of the opinion the court say:

"Such extension of the jurisdiction of equity to regulate and control domestic relations, in addition to the legal and statutory remedies already provided, in our opinion is not supported by authority, warranted by sound reason, or in the interest of good morals or public policy. The opening of such a wide field for injunctive process, enforceable only by contempt proceedings, the difficulty if not impossibility of such enforcement, and the very doubtful beneficial results to be obtained thereby, warrant the denial of such a decree in this case, and require a modification of the judgment in that respect."

In 2 L.R.A. (n.s.) p. 631, et seq., are noted many decisions indicating the refusal of courts of equity to interfere in criminal prosecutions. We quote also from Sullivan et v Gas & Electric Co., 148 Cal. 368, (83 Pac., 156) 3 L.R.A. (n.s.), 401, at 403:

"Every person is subject to the chance that he may be prosecuted for some offense of which he is not only not guilty, but as to which there is no reasonable or probable cause to believe him guilty. The prosecution must, of course, be in some court having jurisdiction of the offense. In that court he has an opportunity to make his defense to the charge, to rebut the evidence against him, and introduce evidence in his favor. The presumption that such court will give him a fair trial and decide justly in his case is as strong as the presumption that a court of equity will fairly try and justly decide his applicaton for an injunction involving the same facts. There is no rule which permits a person to substitute a court of equity for the courts of law in the decision of such matters of fact, and, by anticipatory action therein, take from the regularly constituted criminal courts their jurisdiction of the particular offense in question. All persons must submit to the due process of law in the courts vested with lawful jurisdiction of legal offenses charged against them, and the fact that such courts may give an erroneous decision is no ground for relief in a court of equity, by way of injunction, to prevent them from acting at all, or to interfere with their judgments when made. As was said in Davis v American Soc., 75 N. Y. 362: 'An innocent person, upon an accusation of crime, may be arrested and ruined in his character and property, and the damage he thus sustains is damnum absque

injuria, unless the case is such that he can maintain an action for malicious prosecution or false imprisonment. He is exposed to the risks of such damage by being a member of an organized society, and his compensation for such risks may be found in the general welfare which society is organized to promote'."

It is our conclusion, therefore, that while the jurisdiction of a court of equity will be exercised in a proper case created by new conditions incident to the ever changing conditions in society, that the exercise of such jurisdiction will be as it always has been predicated upon established principles of equity jurisprudence as found in the decisions of the chancellors. To hold otherwise, is to destroy equity jurisprudence itself and relegate it to the realm of conjecture, whim and caprice.

The judgment of the Court of Common Pleas is reversed and the petition of the plaintiff will be dismissed.

MATTHEWS and HAMILTON, JJ, concur.